**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LYNIDA W., <br><br>            Plaintiff, <br><br>   v. <br><br>ANDREW M. SAUL, <br>Commissioner of Social Security, <br><br>            Defendant. | Case No. 19 C 2021 <br><br> Magistrate Judge Sunil R. Harjani |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lynida W. brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits and disabled widow's benefits. Lynida's brief seeks reversal or remand, and the Commissioner' motion for summary judgment asks the Court to affirm the ALJ's decision. For the following reasons, the Commissioner's motion [22] is granted and the ALJ's decision is affirmed.

**BACKGROUND**

In November 2014, Lynida applied for disability insurance benefits and disabled widow's benefits, alleging that she became disabled on July 1, 2009 due to shoulder problems, high blood pressure, headaches, back problems, insomnia, knee problems, and inability to lift and hold with her left arm. Additionally, Lynida suffers from asthma and is morbidly obese. During the administrative hearing, Lynida amended her alleged onset date to January 9, 2014, her 50th birthday. Lynida fractured her left shoulder in a car accident in 2010, resulting in a left shoulder replacement that same year. Lynida is right-handed and can drive a car. She lives with her son and four grandchildren. Lydia has worked since her amended alleged onset date. Lynida

completed three years of college, and her past relevant work history includes merchandise clerk and caregiver.

On November 22, 2017, the ALJ issued a decision finding that Lynida was not disabled from her amended alleged onset date of January 9, 2014 though the date of the decision. (R. 305-16). At step one, the ALJ found that Lynida has not engaged in substantial gainful activity since January 9, 2014. *Id*. at 308. At step two, the ALJ determined that Lynida had the severe impairments of "patellofemoral arthritis; osteoarthritis of the left shoulder, status-post left shoulder fracture; asthma; hypertension; and morbid obesity." *Id*. Further, the ALJ determined that Lynida's mild cardiomegaly, headaches, loss of her voice, shortness of breath, and Achilles tendon pain were non-severe. *Id*. at 309. At step three, the ALJ found that Lynida did not have an impairment or combination of impairments that meets or medically equals the severity of one of the list impairments. *Id*.

Before step four, the ALJ determined Lynida had the RFC to perform light work with the following additional limitations: she can operate foot controls frequently with the bilateral lower extremities; she can frequently operate hand controls bilaterally with the upper extremities; she can occasionally reach overhead, handle, finger, and feel with the left upper extremity; she can frequently reach overhead, handle, finger, and feel with the right upper extremity; she can never climb ladders, ropes, and scaffolds; she can occasionally stoop, kneel, crouch, and crawl; she can frequently climb ramps and stairs and balance; she should avoid concentrated exposure to extreme cold, poorly ventilated areas, dust, odors, fumes and pulmonary irritants; in additional to normal breaks, she can be off-task up to 15 % of the time, and she can be absent one day a month from work. (R. 309-10). At step four, the ALJ found that Lynida is capable of performing her past relevant work as a merchandise clerk and caregiver. *Id*. at 314. Alternatively, at step five, the ALJ

held that other jobs exist in significant numbers in the national economy that Lynida could perform, such as office helper, mail clerk, and label coder. *Id.* at 315-16. Thus, the ALJ found Lynida was not disabled under the Social Security Act. *Id.* at 316.

## **DISCUSSION**

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148,

1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

As an initial matter, Lynida has withdrawn many of her opening arguments. In her opening brief, Lynida advanced a number of arguments in support of reversal based on the ALJ's alleged failure to address the opinion of her treating physician, Dr. Meehak Sethi. The Commissioner's response brief pointed out that Dr. Sethi's Physical RFC Statement dated March 12, 2018 was not in existence when the ALJ issued his decision on November 22, 2017. Lynida's reply brief then acknowledged that her opening brief "mistakenly relied, in part, upon an RFC statement that was submitted by Dr. Sethi prior to the Appeals Council decision but subsequent to the ALJ's decision." Doc. 24 at 1 n.1; *see Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004) (noting that "it is not appropriate for us to consider evidence which was not before the ALJ, but which [plaintiff] later submitted to the Appeals Council" because "the Appeals Council eventually refused [plaintiff's] request to review the ALJ's unfavorable decision."). Lynida asserted that the ALJ's decision was still erroneous with or without consideration of Dr. Sethi's findings. *Id.*

4

Lynida's reply brief states that she "stands on all arguments in her initial memorandum, except those that rely, in whole or in part, on Dr. Sethi's RFC statement." *Id*. Lynida does not argue that the Appeals Council erred in denying review of the ALJ decision, and she does not seek remand based on this evidence under sentence six of 42 U.S.C. § 405(g). Accordingly, the Court finds Lynida has withdrawn her arguments for reversal based on Dr. Sethi's RFC Statement including her challenge to the ALJ's findings that she can stand and/or walk for six hours a day, occasionally reach overhead, handle, finger and feel with left upper extremity, frequently reach overhead, handle, finger, and feel with the right upper extremity, be off-task up to 15% of the time in an eight-hour workday, and absent from work one day per month. Doc. 9-11. Lynida has also withdrawn her argument that the ALJ's failure to mention Dr. Sethi's opinion was reversible error. *Id*. at 14-15. As explained below, Lynida's four remaining arguments are unavailing.

A.  **Consideration of Lynida's Obesity**

*First*, Lynida contends that the ALJ erred in his RFC assessment by failing to account for her morbid obesity. In support, Lynida cites *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014), for the proposition that it is reversible error for an ALJ to fail to "consider the bearing of obesity, even when not itself disabling, on a [claimant's] ability to work." *Id*.

"[W]hile obesity is no longer a standalone disabling impairment, the ALJ must still consider its impact when evaluating the severity of other impairments." *Stephens v. Berryhill*. 888 F.3d 323, 328 (7th Cir. 2018); *Hernandez v. Astrue*, 277 F. App'x 617, 623-24 (7th Cir. 2008) (ALJ must "consider the exacerbating effects of a claimant's obesity on her underlying conditions … when arriving at a claimant's RFC."). That is because "[t]he combined effects of obesity with other impairment(s) can be greater than the effects of each of the impairments considered separately." SSR 19-2p (rescinding and replacing SSR 02-1p), 2019 WL 2374244, at *4 (May 20,

5

2019); *see also Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40.").

In this case, the ALJ adequately considered Lynida's morbid obesity when evaluating her work-related impairments. The ALJ repeatedly stated that he had considered Lynida's obesity. Lynida contends that merely mentioning obesity and announcing that he considered it does not amount to a proper analysis of its exacerbating effects. But the ALJ explicitly considered Lynida's obesity when assessing the severity of her impairments at step two, whether she meets or medically equals a listing pursuant to SSR 02-1 at step three, and in combination with her other impairments in determining her RFC. The ALJ first identified Lynida's morbid obesity as a severe impairment that "significantly limit[s] her ability to perform work activities." (R. 308). The ALJ then considered Lynida's obesity "in relation to the musculoskeletal, respiratory, and cardiovascular body systems listings as required by" SSR 02-1p. *Id.* at 309. In his RFC assessment, the ALJ noted that Lynida is "5 feet and 7 inches tall and has weight ranging from 281-302 pounds for a BMI of 43 to 47.41 kg/m$^2$." *Id.* at 312. The ALJ found that that "combined effects of [Lynida's] patellofemoral arthritis, osteoarthritis of the left shoulder, asthma, and hypertension results in greater physical limitations than might be expected without the obesity." *Id.* The ALJ also found that as result of her obesity, Lynida "experiences greater pain and functional limitations than might be expected from her medically determinable impairments individually." *Id.* Notably, in his RFC assessment, the ALJ found that the "medical record received at the hearing level supports additional postural, manipulative, and environmental" limitations than were opined by the state agency physicians. *Id.* at 313. The ALJ then limited Lynida's RFC to light work with additional postural, manipulative, and environmental restrictions, including limitations on balancing, stooping, crouching, and climbing ramps and stairs, to accommodate the effects of Lynida's

physical impairments, including obesity. *Id*. at 314. Given this record, this is not a situation where the ALJ failed to address Lynida's obesity or overlooked its significance in relation to her knee, shoulder, and other impairments. *Shumaker v. Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015) (rejecting claimant's argument that ALJ failed to adequately account for her obesity where the ALJ concluded that her obesity was a severe impairment, analyzed the effect of obesity on her RFC by referencing SSR 02-1p, and incorporated into the RFC "limitations on balancing, stooping, crouching, climbing ramps and stairs, and handling hazards."); *Joseph M. v. Saul*. 2019 WL 6918281, at *12-13 (N.D. Ill. Dec. 19, 2019).

Moreover, Lynida "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments." *Shumaker*, 632 F. App'x at 867; *see also Hernandez*, 277 F. App'x at 624 ("Hernandez did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do."). "Thus, even if the ALJ had erred in considering how [Lynida's] obesity affects her ability to work, that error would be harmless." *Shumaker*, 632 F. App'x at 869. Lynida merely speculates that there is "[n]o doubt that the strain placed on [her] already failing muscles and joints will result in ongoing and worsening limitations" without articulating what additional obesity-related functional limitations the ALJ should have included in the RFC to accommodate her obesity. Doc. 11 at 12; *see Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (ALJ's failure to even mention claimant's obesity was harmless when the claimant "did not explain how her obesity hampers her ability to work.").

The Seventh Circuit has further held that even if an ALJ fails to explicitly address a claimant's obesity, any error is harmless where the ALJ predicated his decision upon the opinions

7

of physicians who did consider her weight. *See Hernandez*, 277 F. App'x at 624 (where a claimant fails to articulate how her obesity exacerbates her underlying conditions and further limits her functioning the Seventh Circuit has "repeatedly excused as harmless error the failure of an ALJ to explicitly address the claimant's obesity . . . so long as the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity."); *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In this case, the ALJ predicated his decision primarily on the opinions of the state agency consultants, who evaluated Lynida's height, weight, and BMI and opined that she could sit, stand, or walk for about six hours in an eight-hour workday with a postural limitation that restricted her to occasional crawling and a manipulative limitation of occasional overhead reaching with the left upper extremity. (R. 313, 384, 388, 391, 407, 412, 414). To the extent that Lynida argues that the ALJ wrongly reached his RFC conclusion by relying upon the opinions of the state agency doctors who explicitly considered Lynida's obesity in forming their opinions, this argument lacks merit because there was "no doctor's opinion contained in the record [before the ALJ] which indicated greater limitations than those found by the ALJ." *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) (*quoting Rice*, 384 F.3d at 370).

Lynida relies only on *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), where the ALJ "acknowledged that the claimant's obesity was a factor in her leg pain, but did not discuss its bearing on her ability to do sedentary work." *Id*. at 702. The Seventh Circuit recognized that obesity "might make it difficult for [a claimant] to sit for long periods of time, as sedentary work normally requires." *Id*. Unlike in *Browning*, Lynida does not challenge the ALJ's opinion with respect to her sitting ability and the ALJ explicitly considered Lynida's obesity in combination with her other impairments. The ALJ found that Lynida's obesity causes her "greater pain and

functional limitations than might be expected from her . . . impairments individually," but pointed to substantial evidence supporting his conclusion, including the findings of the state agency physicians, that she is able to perform the assigned RFC for a range of light work despite her obesity. (R. 312). Thus, the ALJ did not err with respect to his consideration of how Lynida's obesity affects her ability to work.[1]

**B.     Evaluation of Lynida's Subjective Symptom Statements**

*Second*, Lynida argues that the ALJ's evaluation of her subjective symptoms is flawed. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510. An ALJ must justify his evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at

---

[1]     As to her RFC, Lynida also challenges the ALJ's statement that he accommodated her asthma as well as her cardiac conditions by limiting her to no concentrated exposure to extreme cold, poorly ventilated areas, dusts, odors, fumes and pulmonary irritants. (R. 314). Lynida argues that it is not clear how these environmental restrictions accommodate her cardiac condition because there is no evidence suggesting that her cardiac issues are triggered by environmental factors. Doc. 11 at 10. The Court is not persuaded that the ALJ erred in his consideration of Lynida's heart condition. Lynida does not contest the ALJ's finding that Lynida's mild cardiomegaly was a non-severe impairment. (R. 309). In assessing Lynida's RFC, the ALJ noted that an EKG in April 2015 showed left ventricular hypertrophy with repolarization abnormality with normal sinus rhythm. *Id*. at 312. The ALJ also noted that Lynida was treated for chest pain and chronic hypertension in January and April 2017, but lab results were within normal limit despite elevated CK levels. *Id*. Additionally, the ALJ cited records showing that cardiovascular examinations throughout the relevant time period were significant for regular heart rate and rhythm, normal S1 and S2, and no murmurs. *Id*. The ALJ further noted that Lynida had normal heart examinations and reported no chest pain "per recent treatment records." *Id*. at 313. Thus, the ALJ explicitly considered Lynida's non-severe heart condition, and Lynida does not identify any evidence of greater limitations from her heart condition or explain what specific limitations relating to her heart condition the RFC overlooked.

\*5, 7-8 (Oct. 25, 2017). Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted).

The ALJ considered Lynida's subjective complaints of pain (R. 310-11) but found them not fully credible, explaining that her "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id*. at 313. Lynida's challenges to the ALJ's partially adverse subjective symptom finding are not compelling. Lynida initially claims that the ALJ "revealed a predisposition to doubt [her] capacity for truthfulness based upon impermissible assumptions" and "cherry picked" evidence supporting a conclusion of no disability while ignoring evidence that undermines that conclusion. Doc. 11 at 12-13. Because Lynida cites no evidence of "impermissible assumptions" or specific examples of omitted evidence that undermines the ALJ's subjective symptom conclusion, the Court finds no error in the ALJ's decision in this regard. *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020).

Lynida also takes issue with the ALJ's consideration of the objective medical evidence in performing his subjective symptom assessment. According to Lynida, the ALJ focused too heavily on an "absence of objective medical evidence of physical therapy or other rehabilitative therapy and mild diagnostic findings" to discount her subjective reports of pain. Doc. 11 at 12. Lynida is correct that an ALJ may not disregard a claimant's alleged symptoms solely because they lack an objective explanation. *Ghiselli v. Colvin*, 837 F.3d 771, 777 (7th Cir. 2016) ("absence of objective medical corroboration for a complaint's subjective accounts of pain does not permit an ALJ to disregard those accounts."); *Thomas v. Colvin*, 745 F.3d 802, 806-07 (7th Cir. 2014) ("[A] lack of

10

medical evidence supporting the severity of a claimant's symptoms is insufficient, standing along, to discredit her testimony."); SSR 16-3p, 2017 WLJ 5180304, at *5 (Oct. 25, 2017). However, an ALJ can consider the lack of supporting objective evidence to discount a claimant's subjective symptoms along with other factors. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) ("even if an ALJ may not base a decision solely on the lack of objective corroboration of complaints of pain," "the lack of objective support from physical examinations and test results is still relevant"); *Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003) ("the regulations direct the ALJ to evaluate medical evidence and to look for objective medical evidence that corroborates a claimant's subjective statements of pain."); *see also* SSR 16-3p, 2017 WL 5180304, at *5 ("minimal or negative findings or inconsistencies in the objective medical evidence is one of many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."). That is exactly what the ALJ did here. The ALJ did not disregard Lynida's subjective complaints solely because they were not substantiated by objective medical evidence. Rather, the ALJ provided several reasons for discounting Lynida's subjective symptom allegations, including lack of objective medical evidence, essentially routine appointments and medication for treatment of her impairments but no additional conservative treatment, ability to perform activities of daily living, and her continuing part-time work. (R. 313).

The ALJ appropriately evaluated Lynida's alleged symptoms in the context of the objective medical evidence and type of treatment and medication she received. In doing so, the AJ noted that the medical records show that Lynida generally presented for routine appointments for treatment of her impairments. (R. 313). The ALJ noted that Lynida takes medication for high blood pressure and asthma, uses Naproxen (Aleve) for pain, and her blood pressure is under control with her current medications. *Id.* at 311, 357-58. Aside from medication and acute medical

11

treatment for chest pain, the ALJ did not find records of "any additional conservative treatment modalities in the record." *Id*. at 313. Further, the ALJ noted an absence in the record of physical therapy or any other rehabilitative therapy, although Lynida was referred to physical therapy for management of her knee pain. *Id*. at 313, 354. Additionally, the ALJ explained that Lynida's asthma was assessed as mild and intermittent in nature, she had normal heart and lung examinations, and she reported no chest pain or shortness of breath in recent treatment records. *Id*. at 313. The ALJ also considered the diagnostic imaging of Lynida's shoulder and extremities which was consistent with mild degenerative changes and mild neuropathy. *Id*. The ALJ cited numerous records showing physical examinations demonstrating left shoulder tenderness with normal range of motion, no joint swelling, normal muscle strength and tone, and normal gait. *Id*.

The objective medical evidence cited by Lynida in her brief largely consists of mild and minimal imaging and examination findings which do not undermine the ALJ's determination. Doc. 11 at 13 *citing* (R. 680) (9/30/2014 – x-ray showing minimal osteoarthritis of left shoulder); *id*. at 690 (10/16/2014 – x-ray showing good alignment and position of left shoulder joint prosthesis); *id*. at 703, 705 (4/17/2015 – consultative examination finding mild atrophy of the left shoulder and 4/5 strength in left upper extremity); *id*. at 947 (x-ray revealing minimal degenerative changes of left acromioclavicular joint and grossly intact left humeral head prosthesis); *id*. at 1387-88 (6/7/2017 – electrodiagnostic study showing mild/early peripheral polyneuropathy in the lower extremity, generalized weakness in all the extremities, and decreased but present knee and ankle jerk). Moreover, the ALJ considered this evidence and the other pieces of evidence Lynida cites in her brief. *See id*. at 309, 311, 312. Accordingly, the ALJ reasonably concluded that Lynida's course of treatment and the minimal objective findings undercut her allegation that she was completely disabled. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (where "the objective

medical evidence consistently revealed only mild degenerative change … the ALJ properly relied upon the discrepancy" to find the claimant not credible).

In addition to the minimal objective findings, the ALJ properly considered other factors, including Lynida's daily activities, in discounting her subjective symptoms. Citing *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), Lynida argues that the ALJ impermissibly equated her daily activities with an ability to work full-time. While there are "critical differences between activities of daily living and activities in a full-time job," it is entirely permissible for an ALJ to consider a claimant's daily activities in evaluating the severity of her symptoms. *Id*. at 647; *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) ("An ALJ may not equate activities of daily living with those of a full-time job. But an ALJ is not forbidden from considering statements about a claimant's daily life."); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). In this case, the ALJ did not improperly equate Lynida's ability to perform certain activities of daily living with an ability to work full-time. Specifically, the ALJ considered Lynida's activities of daily living as one factor in determining whether her symptoms were as severe and limiting as she alleged. The ALJ noted Lynida's reported ability to independently manage her personal care needs, prepare simple meals, occasionally complete light household chores, drive, grocery shop with assistance, watch television, and work part time after her alleged onset date. (R. 313). The ALJ reasonably concluded that while not extensive, this "somewhat normal level of daily activity and interaction," undermined her allegation of disabling pain. *Id.*

Furthermore, the ALJ permissibly relied on Lynida's part-time work activities unpacking magazines from boxes and placing them on shelves as "suggest[ing] that the claimant's daily activities, at least at times, have been somewhat greater than she has generally reported." (R. 313); *see also Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (claimant's "work … albeit on a part-

13

time basis … cuts against his claim that he was totally disabled.") *Steward v. Bowen*, 858 F.2d 1295, 1300 n.7 (7th Cir. 1988) (claimant's continued work at her old job on a part-time basis was one factor the ALJ properly considered). As the ALJ noted, despite her impairments, Lynida was able to work one day a week at the time of the hearing and she used to work more frequently. (R. 310). She testified that she had been working for one day a week for the past month but prior to that had been working three or four days per week, sometimes up to five hours per day. *Id*. at 345-46, 370, 374. Lynida also worked as a caregiver for an elderly woman during the time she alleged disability. *Id*. at 348-49. In sum, the ALJ's reasons for finding Lynida's subjective statements to be not fully credible are sound and are not patently wrong.

**C.     Assessment of Opinion Evidence**

*Third*, Lynida claims that the ALJ's assessment of the opinions from state agency physicians James Madison, M.D., and Mary Ann Westfall, M.D., and consultative examiner Bhavana P. Vaidya, M.D., is erroneous. In a two-sentence argument regarding the state agency physicians, Lynida claims that the ALJ "rejected their findings [and] . . . then stated that those same opinions are consistent with the record. This makes no sense." Doc. 11 at 15. Contrary to Lynida's contention, the ALJ did not reject the opinions of Drs. Madison and Westfall but instead gave "significant weight to them." (R. 313). Nor did the ALJ acknowledge that subsequent medical evidence rendered the state agency consultants' opinions obsolete, as Lynida claims. Instead, the ALJ provided two legitimate reasons for giving significant weight to the state agency consultants' opinions. First, the ALJ explained that "the objective medical evidence supported the degree of limitation noted by Drs. Madison and Westfall." *Id*. The ALJ noted that the state agency consultants "identified clinical findings such as 4+/5 strength in the left upper extremity, mild atrophy of the left shoulder, blood pressure of 164/87, limited range of motion in the left shoulder,

14

and intact ability for fine and gross manipulations in both upper extremities." *Id*. Lynida does not contest the ALJ's finding that these "mild findings are consistent with the degree of limitation identified in the opinion[s]." *Id*. Second, the ALJ noted that "Drs. Madison and Westfall based their opinions on a thorough review of the record and the contemporaneous treatment notes from the claimant's treatment providers, which routinely identified normal objective exams, and that the claimant has only required intermittent conservative care during the relevant time period." *Id*. The ALJ found that overall, Drs. Madison and Westfall's opinions were consistent with the record but also noted that "medical evidence of record received at the hearing level supports additional postural, manipulative, and environmental [limitations]." *Id*.

When assessing Dr. Madison's and Westfall's opinions, the ALJ properly recognized that the record as a whole warranted the inclusion of more restrictive postural, manipulative, and environmental restrictions than those found by Drs. Madison and Westfall. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."). As a result and in addition to the postural and manipulative limitations of occasional crawling and occasional overhead reaching in the left upper extremity found by the state agency consultants, the ALJ determined that Lynida can never climb ladders, ropes, and scaffolds; can occasionally stoop, kneel, and crouch; can frequently climb ramps and stairs and balance; can occasionally handle, finger, and feel with the left upper extremity; and can frequently reach overhead, handle, finger, and feel with the right upper extremity. (R. 310). The ALJ also added environmental limitations to avoid concentrated exposure to extreme cold, poorly ventilated areas, dust, odors, fumes, and pulmonary irritants to accommodate medical evidence received at the hearing level regarding the effects of Lydia's asthma. *Id*. at 310, 314. The ALJ was

15

entitled to rely on the state agency doctors in reaching Lynida's RFC, and the record before the ALJ contained no other medical opinions suggesting that Lynida is more limited than the ALJ concluded. *Best*, 730 F. App'x at 382; *Mason v. Colvin*, 2014 WL 5475480, at *7 (N.D. Ill. Oct. 29, 2014) ("The medical opinion of a state agency reviewing physician … can constitute substantial evidence to support an ALJ's opinion, especially where there is no medical opinion to contradict it."). As such, Lynida has failed to show that the ALJ erred when he afforded significant weight to the opinions of state agency consultants but also included greater postural, manipulative, and environmental limitations in the RFC determination than those opined by the state agency physicians.

The Court also finds no error in the ALJ's assessment of Dr. Vaidya's opinion. The ALJ considered Dr. Vaidya's consultative report but reasonably gave it "limited weight," explaining that Dr. Vaidya did not provide specific functional restrictions and the limitations he did provide were vague. (R. 312). For example, Dr. Vaidya concluded: "The claimant can sit and stand. The claimant can walk 50 feet unassisted. The claimant can hear, speak, and converse in English. The claimant's ability to lift, carry, and handle objects is adequate. The claimant's ability to carry out work-related activities is normal." *Id*. at 703. Dr. Vaidya's failure to provide specific functional limitations is a valid reason to discount his opinion. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (consultative examiner's "evaluation did not include a *functional* assessment of [claimant's] abilities, nor did she opine about any limitations [claimant's] impairments may have caused, so her report could not be used to support specific limitations included in [claimant's] residual functional capacity."); *Quisenberry v. Comm'r of Social Security*, 757 F. App'x 422, 431 (6th Cir. 2018) (ALJ properly gave little weight to consultative examiner's opinion which was "quite vague, as she did not actually propose any specific functional limitations that would

16

preclude the claimant from returning to 'productive employment'"). After assigning limited value to Dr. Vaidya's vague assessment, the ALJ appropriately considered Dr. Vaidya's opinion in the context of the entire medical record and concluded that Dr. Vaidya's "objective findings are consistent with other medical evidence of record." (R. 312). For instance, as the ALJ noted, during the consultative examination with Dr. Vaidya, Lynida "exhibited mild atrophy of the left shoulder and 4/5 left upper extremity strength, although she maintained full strength in all other extremities, full knee range of motion, intact sensation, and 2+ deep tendon reflexes." *Id*. at 311, 703, 706. Moreover, the state agency physicians Drs. Madison and Westfall used Dr. Vaidya's consultative examination findings as a source for their opinions, and thus, Dr. Vaidya's examination findings were incorporated into the ultimate RFC. *Id*. at 388-89, 412.

Finally, Lynida attacks the following statement made by the ALJ after he discounted Dr. Vaidya's opinion: "Nevertheless, to the extent Dr. Vaidya's findings are consistent with the residual functional capacity, they are accorded some weight." (R. 312). Lynida argues that the ALJ found Dr. Vaidya's "opinion [] reliable as long as it is consistent with the ALJ's own lay opinion." Doc. 11 at 15. The Commissioner acknowledges that "[w]hile this last sentence of [the ALJ's] assessment might have been better phrased, it does not indicate that the ALJ 'made up his own rules for evaluating opinion evidence.'" Doc. 23 at 15. Lynida is correct that the ALJ citation to the RFC to evaluate Dr. Vaidya's report is unhelpful because an adjudicator "gets things backwards" when he invokes the RFC to evaluate an expert's report. *Carolyn S. v. Saul*, 2020 WL 231085, at *9 (N.D. Ill. Jan. 15, 2020) (*citing Bjornson*, 671 F.3d at 645-46) (addressing relation between the RFC and a credibility assessment). An ALJ must first assess an expert's evaluation of the claimant's functioning and then determine the RFC, not the other way around. *Id*. However, by analogy to the "backwards" subjective symptom boilerplate language that has been criticized

17

by the Seventh Circuit, the Court finds that this "backwards" reasoning only amounts to reversible error where the ALJ fails to provide an otherwise adequate explanation for discounting the expert's opinion. *See Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) ("The use of boilerplate is innocuous when . . . the language is followed by an explanation for rejecting the claimant's testimony."); *Pepper*, 712 F.3d at 367-68 ("the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination."). Here, as discussed above, the ALJ provided sufficient other reasons for discounting Dr. Vaidya's vague opinion which did not provide specific functional limitations. Accordingly, the ALJ's decision to give Dr. Vaidya's opinion limited weight because it was of little value in developing an RFC is supported by substantial evidence.

**D.    Step Four Determination**

*Fourth*, Lynida contends that the ALJ's step four finding that she can perform her past relevant work is not supported by substantial evidence because: (1) there are discrepancies between the DOT's exertional descriptions of the jobs given by the VE (merchandise clerk-heavy and caregiver-medium) and Lynida's description of her past work as performed (light); (2) the ALJ engaged in an "insurmountable leap" in concluding that Lynida could perform her prior work which was performed at a light exertional level and on a part-time basis; and (3) the RFC included occasional handling and reaching restrictions with Lynida's left upper extremity which is inconsistent with the DOT which provides that the merchandise clerk job involves frequent handling and reaching. Based on his RFC determination and the testimony of the VE, the ALJ concluded at step four that Lynida was able to perform her past relevant work as "actually performed," not as performed in the national economy. (R. 314).

18

Even if Lynida was correct that the ALJ erred by finding that Lynida could perform her past relevant work at step four, the alleged errors are harmless because the ALJ continued on in the sequential analysis and Lynida does not challenge the other jobs identified by the VE at step five—office helper, mail clerk, and label coder. At the hearing, the ALJ asked the VE whether a hypothetical individual with the light RFC the ALJ assigned to Lynida could perform other jobs. (R. 375). The VE testified that Lynida could perform other jobs existing in significant numbers in the national economy, such as office helper (35,700 to 35,800 jobs), mail clerk (32,800 to 32,900 jobs), and label coder (37,800 to 37,900 jobs). *Id.* at 375-76. The ALJ, relying on the VE's testimony, found that Lynida was "capable of making a successful adjustment" to other work such as an office helper, mail clerk, or label coder. *Id.* at 315-16. Therefore, the outcome would be the same even if the ALJ had concluded at step four of the analysis that Lynida could not perform her past work as she performed it. *See Guranovich v. Astrue*, 465 F. App'x 541, 543 (7th Cir. 2012) ("Because the ALJ's decision would be the same under this alternative RFC at step five, any error at step four was harmless."); *Ziegler v. Astrue,* 336 F. App'x 563, 570–71 (7th Cir. 2009) (finding harmless ALJ's determination at step four that plaintiff could perform his past job as he had actually done where ALJ made alternative finding at step five that plaintiff could perform other jobs that exist in significant numbers). Because Lynida has not shown that the ALJ's RFC finding or alternate finding at step five that Lynida could perform other jobs existing in significant numbers in the national economy was erroneous, it is unnecessary to address Lynida's arguments regarding step four.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion [22] is granted and the ALJ's decision is affirmed.

19

**SO ORDERED.**

Dated: May 19, 2020

_____
Sunil R. Harjani
United States Magistrate Judge